[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————

No. 11-14192

————————

D. C. Docket No. 4:03-cv-00411-SPM-GRJ

FRESENIUS MEDICAL CARE HOLDINGS, INC.,
a Foreign Corporation
d.b.a. Fresenius Medical Care North America,
DAVITA, INC.,
a Foreign Corporation,

Plaintiffs-Appellants,

DVA RENAL HEALTHCARE, INC.,
a Foreign Corporation

Plaintiff,

versus

ELISABETH TUCKER, M.D.,
in her official capacity as Chair of the
Florida Board of Medicine,
M. RONY FRANCOIS, MD MPHS PhD,
MAMMEN ZACHARIAH, MD,
MARK S. AVILA, MD,
H. FRANK FARMER, JR., MD, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 10, 2013)

Before DUBINA, Chief Judge, CARNES and GILMAN,* Circuit Judges.

DUBINA, Chief Judge:

This case involves a constitutional challenge to Florida's "Patient Self-Referral Act of 1992" (the "Florida Act"), FLA. STAT. § 456.053, which prohibits Florida physicians from referring their patients for services to business entities in which the referring physicians have a financial interest.  Appellants Fresenius Medical Care Holdings, Inc., DVA Renal Healthcare, Inc., and Davita, Inc. (collectively "Appellants") sued the Secretary of the Florida Department of Health, the members of the Florida Board of Medicine, and the members of the Florida Board of Osteopathic Medicine (collectively "Florida") seeking declaratory and injunctive relief.  Appellants allege that the Florida Act is unconstitutional because it is (1) preempted by federal law, (2) violative of the dormant Commerce Clause, and (3) violative of substantive due process.  The district court found no constitutional violation and granted summary judgment in favor of Florida.  After

_____

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

considering the parties' briefs and having the benefit of oral argument, we affirm the judgment of the district court.

## I.

### A. Statutory background

*Federal Stark laws*

In an effort to contain health care costs and reduce conflicts of interest, Congress passed legislation in 1989 and 1993 that prohibits physicians from referring their Medicare and Medicaid patients to business entities in which the physicians or their immediate family members have a financial interest. *See* Pub. L. No. 101-239, 103 Stat. 2106, Pub. L. No. 103-66, 107 Stat. 312 (codified at 42 U.S.C. § 1395nn(a)). The laws are respectively known as "Stark I" and "Stark II," and we collectively refer to them as "Stark." In promulgating regulations to implement Stark, the Secretary of Health and Human Services (the "Secretary") has created various exemptions from the physician self-referral ban, including two exemptions relevant to this case. First, Stark exempts physician referrals to associated entities for clinical laboratory services related to the treatment of end-stage renal disease ("ESRD"). *See* 42 C.F.R. § 411.351. Second, Stark allows physician referrals for designated health services, including laboratory services, to entities owned by a publicly traded company in which the referring physician is a

shareholder, so long as the company has stockholder equity in excess of $75 million.  *See* 42 C.F.R. § 411.356(a).  All Appellants benefit from the former exemption, and Davita and Fresenius also benefit from the latter.

*The Florida Act*

In 1992, the Florida Legislature enacted the challenged statute for reasons similar to Congress's reasons for enacting Stark, finding specifically that physician self-referral practices "may limit or eliminate competitive alternatives in the health care services market, may result in overutilization of health care services, may increase costs to the health care system, and may adversely affect the quality of health care."  FLA. STAT. § 456.053(2).  Thus, the Florida Act essentially serves the same purpose as Stark by regulating physician self-referrals.  The Florida Act makes unlawful (1) a physician's referral of a patient to a clinical laboratory service provider in which the physician has an ownership or other financial interest or (2) any presentation of a claim for payment for health care services rendered in violation of the Act.  *Id*. § 456.053(5)(a), (c).  The statute provides that violators are subject to disciplinary action by the State of Florida and a civil penalty of not more than $15,000 for knowing violations.  *Id.* § 456.053(5)(e), (g).  Originally, the Florida Act, like Stark, exempted physicians in the renal dialysis industry from the self-referral prohibition.  *See id.* § 455.654(3)(o)3.h., 3.*l*. (2000).

4

Most ESRD patients in Florida are covered by Medicare or Medicaid,[1] and most qualify for benefits under Medicare's ESRD program that reimburses dialysis clinics for laboratory services through a bundled rate that includes payment for dialysis care and laboratory services. Apparently, the single rate reimbursement strongly reduces the risk of fraud or excessive costs to patients or the government. For this reason, the Florida House of Representatives Committee on Health Regulation in 2001 recommended against removing the physician self-referral exemption for Florida doctors serving ESRD patients. Nevertheless, the Florida Legislature amended the Florida Act in 2002 to repeal the ESRD exemption.

B.  Facts and district court proceedings

Appellants are out-of-state corporations providing renal dialysis services in Florida, both directly and through subsidiary corporations, to patients suffering from ESRD. Appellants wish to use a vertically integrated business model in Florida, referring all their ESRD patients' blood work to associated laboratories after providing the patients with dialysis treatment at their clinics. They contend that this business model is more efficient and better for ESRD patients than a non-integrated system where providers refer patients to independent laboratories for blood work. However, keeping laboratory blood work within Appellants' network

---

[1] Medicare covers not only persons aged 65 and older, but also individuals of any age "who are medically determined to have [ESRD]." 42 U.S.C. § 1395c.

would require its employee-physicians to violate the Florida Act, as they have financial interests in Appellants' laboratories. According to the record and the briefs, Appellants' only competitor providing laboratory services to ESRD patients is a Florida business that is not vertically integrated, and thus, it is unaffected by the Florida Act. Appellants claim that the Florida Legislature passed the 2002 Amendments to the Florida Act to benefit their competitor.

In 2003, after passage of the 2002 Amendments, Appellants sued for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, requesting a declaration that the Florida Act is unconstitutional. The complaint alleges that: (1) the Florida Act is preempted by federal law; (2) the Florida Act violates the dormant Commerce Clause because it is protectionist and discriminatory against only out-of-state renal dialysis providers with vertically integrated business models; and (3) the Florida Act violates substantive due process because it was not enacted with a legitimate purpose and because it is not rationally related to the Florida Legislature's stated purposes for enacting the Florida Act. The district court stayed this case until 2006. In 2007, Appellants moved for summary judgment, and Florida filed a cross-motion for summary judgment. Four years later, the district court entered summary judgment in Florida's favor. Following

the denial of Appellants' motion for reconsideration, Appellants timely appealed to this court.

## II.

We review the grant of summary judgment *de novo*, drawing all inferences and reviewing all the evidence in the light most favorable to the non-moving party. *Curves, LLC v. Spalding Cnty., Ga.*, 685 F.3d 1284, 1289 (11th Cir. 2012) (per curiam). We also review *de novo* the constitutionality of a challenged statute. *Id.*

## III.

### A. Preemption

The Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI., cl. 2. Consequently, federal law may preempt state law expressly or by implication. *Arizona v. United States*, ___ U.S. ___, 132 S. Ct. 2492, 2500–01 (2012). Although Congress's "express statement on pre-emption is always preferable, the lack of such a statement does not end [the] inquiry." *PLIVA, Inc. v. Mensing*, ___ U.S. ___, 131 S. Ct. 2567, 2577 n.5 (2011). State law can be impliedly preempted by federal law in cases of field preemption and conflict preemption. Field preemption exists where Congress determines that a certain field must be regulated exclusively by the federal

7

government.  *Arizona*, ___U.S. at___, 132 S. Ct. at 2501–02.[2]  Conflict

preemption, however, arises in instances where (1) "compliance with both federal

and state regulations is a physical impossibility," or (2) "the challenged state law

stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress."  *Id.* at ___, 132 S. Ct. at 2501 (internal citations and

quotation marks omitted).  We use our judgment to determine when state law

creates an unconstitutional obstacle to federal law, and "this judgment is informed

by examining the federal statute as a whole and identifying its purpose and

intended effects."  *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691

F.3d 1250, 1263 (11th Cir. 2012) (internal quotation marks omitted) (quoting

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294

(2000)).

Moreover, in conducting preemption analysis, we "should assume that the

historic police powers of the States are not superseded unless that was the clear and

manifest purpose of Congress."  *Arizona*, ___U.S. at___, 132 S. Ct. at 2501

(internal quotation marks omitted); *see also Wyeth v. Levine*, 555 U.S. 555, 565,

129 S. Ct. 1187, 1194–95 (2009) (reasoning that there are "two cornerstones of

[Supreme Court] pre-emption jurisprudence": first, that "the purpose of Congress

---

[2] Stark is part of the broader regulatory scheme for Medicare and Medicaid.  The Medicare and Medicaid programs are built upon the principle of federal and state cooperation; thus, Appellants do not argue that field preemption applies in this case.

8

is the ultimate touchstone;" and second, "the assumption that the historic police powers of the States were not to be superseded" by federal law unless preemption was clearly Congress's purpose (internal quotation marks omitted)).  The Supreme Court has stated that these assumptions create a "high threshold" for a party alleging conflict preemption.  *See, e.g.*, *Chamber of Commerce of U.S. v. Whiting*, ___ U.S. ___, 131 S. Ct. 1968, 1985 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110, 112 S. Ct. 2374, 2389 (1992) (Kennedy, J., concurring)).

Appellants argue that conflict preemption exists in this case because the Florida Act improperly prohibits and penalizes what federal regulation permits, and it contravenes Congress's intent to benefit Medicare and Medicaid recipients, providers, and the government, as payor, by allowing physician self-referral in the ESRD-treatment context.  The district court rejected these arguments and concluded that Congress did not intend for Stark to preempt state laws like the Florida Act.  In the absence of express language in Stark, the district court looked to Congress's intent, as stated in a conference report discussing amendments to Stark, that "[f]ederal law [should] not preempt State laws that are more restrictive." H.R. REP. NO. 103-213, at 1507 (1993) (Conf. Rep.).  Furthermore, the district court considered the Secretary's regulations implementing Stark, which

9

acknowledge that the regulations "do[] not provide for exceptions or immunity from civil or criminal prosecution or other sanctions applicable under any State laws." 42 C.F.R. § 411.350(b). The district court also reasoned that the regulation of medical fees was and is a typical exercise of state police power, and that the Florida Legislature was not alone in imposing physician self-referral restrictions that are more restrictive than federal law.

According to Appellants, the language in the House conference report demonstrates only that Stark does not preempt state laws that are "more restrictive" of conduct that Stark *prohibits*, but Stark does preempt conflicting state laws prohibiting conduct that Stark *allows*. In other words, Appellants posit that Florida may impose penalties that are more restrictive than federal law on physicians who violate conduct prohibited by federal law, so long as Florida does not attempt to penalize conduct that federal law permits. Appellants assert that even if their interpretation is wrong, this court should not give much weight to the district court's interpretation because Congress entertained, but ultimately rejected, a draft of a proposed anti-preemption subsection "(j)" that would have provided that Stark "shall [not] preempt provisions of State law." [R. 93-2 at 3.] Thus, Appellants argue that Congress's decision not to include this anti-preemption language reflects the intent to preempt at least some state laws. Moreover, Appellants assert that 42

10

C.F.R. § 411.350(b) shows only that the Secretary interprets Stark as not preempting state laws imposing higher criminal penalties above Stark's civil penalties.

For several reasons, we are not persuaded by Appellants' arguments. Primarily, we do not see the existence of an actual conflict. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884, 120 S. Ct. 1913, 1927 (2000) ("[C]onflict pre-emption . . . turns on the identification of 'actual conflict' . . . ."). Any physician employed by any of the Appellants who provides clinical care for ESRD patients in Florida can comply with the Florida Act without neglecting any obligations under federal law. Indeed, Appellants have managed to operate their businesses and their physicians have served ESRD patients in Florida for several years. Thus, we see no "physical impossibility," *see Arizona*, ___U.S. at ___, 132 S. Ct. at 2501, preventing Appellants' compliance with both federal and state laws.

Second, we agree with the district court that the Florida Act does not frustrate Congress's legislative intent or the Secretary's interpretation and implementation of Stark. In the absence of impossibility, conflict preemption applies in situations where state law acts as an obstacle or frustration to the purposes of Congress. *Id*. at ___, 132 S. Ct. at 2501. While the Florida Act frustrates Appellants' vertically integrated business model, there is no evidence

11

that the Florida Act frustrates the purposes of Stark.  In fact, legislative history provides evidence to the contrary.  *See* H.R. REP. NO. 103-213, at 1507 (1993) (Conf. Rep.) (stating that the conferees "intend that Federal law not preempt State laws that are more restrictive").  It makes little difference to us that Congress considered but failed to include express language stating that nothing in Stark should preempt state law.  *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306, 108 S. Ct. 1145, 1154 (1988) (stating that the Supreme Court "generally is reluctant to draw inferences from Congress'[s] failure to act").

Moreover, the Secretary's regulations implementing Stark are consistent with the language in the House conference report.  It is appropriate to consider "the promulgating agency's contemporaneous explanation of its objectives" as well as "the agency's current views of the regulation's pre-emptive effect."  *See Williamson v. Mazda Motor of Am., Inc.*, ___ U.S. ___, 131 S. Ct. 1131, 1136 (2011).  Upon enactment of amendments to Stark in 1993,[3] as well as today, the Secretary's regulations implementing Stark state that the regulations "do[] not provide for exceptions or immunity from civil or criminal prosecution or other sanctions applicable under any State laws or under Federal law other than section

---

[3] *See* Medicare Program; Physician Financial Relationships With, and Referrals to, Health Care Entities That Furnish Clinical Laboratory Services and Financial Relationship Reporting Requirements, 60 Fed. Reg. 41,914, 41,978 (Aug. 14, 1995) (codified at 42 C.F.R. § 411.350(b)).

1877 of the Act." 42 C.F.R. § 411.350(b). In other words, a physician who would be civilly or criminally liable for self-referral under a state law like the Florida Act will find no shelter in the Secretary's federal exemption for the same conduct. The remainder of the regulation makes the Secretary's interpretation of the law clear. "For example, although a particular arrangement involving a physician's financial relationship with an entity may not prohibit the physician from making referrals to the entity under this subpart, *the arrangement may nevertheless violate another provision of . . . other laws administered by . . . any . . . State agency.*" *Id.* (emphasis added). The Florida Act is such an "other law" administered by Florida that properly prohibits what Stark permits.

For all these reasons, we conclude that conflict preemption doctrine does not apply, and the exemptions in federal law allowing physicians serving ESRD patients to engage in self-referral do not preempt Florida's more restrictive law prohibiting such conduct.

## B.  Dormant Commerce Clause

The Commerce Clause empowers Congress to regulate interstate commerce. *See* U.S. CONST. art. I, § 8, cl. 3. "Although the clause speaks literally only to the powers of Congress, it is well settled that it has a 'dormant' aspect as well . . . ." *Bainbridge v. Turner*, 311 F.3d 1104, 1108 (11th Cir. 2002). The dormant

13

Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state interests by burdening out-of-state competitors." *Wyoming v. Oklahoma*, 502 U.S. 437, 454, 112 S. Ct. 789, 800 (1992) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74, 108 S. Ct. 1803, 1807 (1988)).  To determine whether a particular state law violates the dormant Commerce Clause, a court first determines whether the challenged law discriminates against interstate commerce because a discriminatory law is "virtually *per se* invalid."  *See Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality of Ore.*, 511 U.S. 93, 99, 114 S. Ct. 1345, 1350 (1994).  Such a law "will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'"  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338, 128 S. Ct. 1801, 1808 (2008) (quoting *Ore. Waste*, 511 U.S. at 101, 114 S. Ct. at 1351).  But "[w]here [a state law] regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847 (1970).[4]

---

[4] The scheme for scrutinizing alleged dormant Commerce Clause violations has also been stated in terms of whether a state law has "direct" or "indirect" effects on commerce.

14

Appellants do not argue that the Florida Act is facially discriminatory because the Florida Act makes no distinction between in-state and out-of-state businesses, and it does not exclude out-of-state businesses from operating in Florida.  Rather, Appellants argue that the Florida Act has the practical effect of discriminating against out-of-state commerce.  *See Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 350–51, 97 S. Ct. 2434, 2445 (1977) (recognizing that a state law may violate the dormant Commerce Clause by having the "practical effect" of discriminating in its operation, even though the law is neutral on its face).  If Appellants are correct that the Florida Act has the practical effect of discriminating against them, the "strictest scrutiny" applicable to a facially discriminatory law would apply here as well.  *See Ore. Waste*, 511 U.S. at 101, 114 S. Ct. at 1351.  In that instance, we would require Florida to show that (1) the statute has a legitimate local purpose; and (2) there are no adequate, reasonable, nondiscriminatory alternatives.  *See Hunt*, 432 U.S. at 353, 97 S. Ct. at 2446.

---

> If a regulation directly regulates or discriminates against interstate commerce, or has the effect of favoring in-state economic interests, the regulation must be shown to advance a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.  If a regulation has only indirect effects on interstate commerce, we examine whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 846 (11th Cir. 2008) (internal quotations, citations, and alterations omitted).

Appellants allege that because the Florida Act impacts only out-of-state businesses, the district court erred in finding no discriminatory impact. Appellants further argue that the district court failed to find that the prohibition on physician self-referral serves no legitimate purpose in an ESRD treatment context and that there are nondiscriminatory alternatives to the law. But because the law operates to burden in-state and out-of-state ESRD health care providers alike, Appellants fail to convince us that the Florida Act has the practical effect of discriminating against interstate commerce.

The Supreme Court's decision in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S. Ct. 2207 (1978), is analogous and instructive here because it offers an example of a state law that incidentally, but not unconstitutionally, burdened some out-of-state businesses. In *Exxon*, the Maryland Legislature passed a statute prohibiting a producer or refiner of petroleum products from operating any retail gasoline station within the state and requiring producers and refiners to extend all temporary price reductions to all retail stations they supplied. 437 U.S. at 119–121, 98 S. Ct. at 2211. The Maryland Legislature passed the statute in response to complaints about the inequitable distribution of gasoline among retail stations during the 1973 oil shortage. *Id.* at 121, 98 S. Ct. at 2211. The law "was designed to correct the inequities in the distribution and pricing of gasoline" by prohibiting

16

companies from doing business in Maryland as both producers and retailers. *Id.* at 121, 98 S. Ct. at 2211 (internal quotation marks omitted).

Exxon and other refiners argued that the law discriminated against interstate commerce at the retail level because the burden of divesting retail service stations fell solely on the interstate companies, as there were no Maryland-based refiners at that time. *See id.* at 125, 98 S. Ct. at 2213–14. The statute, they argued, protected Maryland independent retailers from competition because the out-of-state refiners and producers who previously operated gasoline stations would no longer have a competitive advantage over the independent retailers in terms of pricing and other special services. *Id.* at 125, 98 S. Ct. at 2213–14. The Supreme Court rejected the oil refiners' argument because the dormant Commerce Clause does not "protect[ ] … particular structure[s] or methods of operation in a retail market." *Id.* at 127, 98 S. Ct. at 2215. Instead, it "protects the *interstate market*, not particular *interstate firms*, from prohibitive or burdensome regulations." *Id.* at 127–28, 98 S. Ct. at 2215 (emphasis added). The Court reasoned: "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Id.* at 126, 98 S. Ct. at 2214. And while oil refiners would no longer enjoy the same status in the Maryland retail market, in-state independent retailers would not have an advantage over out-of-

17

state retailers; nor were there any barriers impeding out-of-state retailers from entering the Maryland retail market.  *See id.* at 126, 98 S. Ct. at 2214.  Thus, there was no discriminatory effect.

Similar to the oil refiners in *Exxon*, Appellants feel singled out by the Florida Act because they are out-of-state entities, and the law adversely affects only them—but not the lone, in-state competitor providing ESRD laboratory services.  Yet the Florida Act prohibits vertical integration of renal dialysis clinics and laboratories regardless of whether a business entity is in-state or out-of-state.  Although the burden at present falls solely on Appellants, and although they may no longer enjoy certain competitive advantages over an in-state competitor, the Florida Act does not inhibit the competitive, interstate market for the provision of renal dialysis clinical and laboratory services.  Out-of-state businesses may freely enter the market to operate clinics and laboratories in Florida so long as they comply with the Florida Act's prohibition against physician self-referrals.

In keeping with the analysis of *Hunt*, Appellants further argue that the Florida Act serves no legitimate purpose, and that there are reasonable nondiscriminatory alternatives.  However, because the Florida Act does not discriminate in effect against interstate commerce, it is not Florida's burden to demonstrate the Act's legitimate purpose or the non-existence of

18

nondiscriminatory alternatives.  Rather, we inquire whether the Florida Act's burden on interstate commerce is clearly excessive in relation to the law's putative benefits.  *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S. Ct. 715, 728 (1981) (citing *Pike*, 397 U.S. at 142, 90 S. Ct. at 847).  Appellants rest their case on the argument that the Florida Act is discriminatory in effect, and they offer no analysis pursuant to the less stringent standard in *Pike*.

We hold that the district court correctly found that the Florida Act serves a legitimate local interest—the protection of Florida patients—and that the law's burden on out-of-state businesses from providing ESRD care in Florida is not excessive.  Appellants allege that the Florida Legislature passed the law haphazardly, without regard for its consequences on health care for Florida's ESRD patient population.  We, however, agree with the district court that "[t]hese arguments go to 'the wisdom of the statute, not to its burden on commerce.'" *Fresenius Med. Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1369 (N.D. Fla. 2011) (quoting *Exxon*, 437 U.S. at 128, 98 S. Ct. at 2215); *see also Ferguson v. Skrupa*, 372 U.S. 726, 729, 83 S. Ct. 1028, 1030 (1963) ("[I]t is up to legislatures, not courts, to decide on the wisdom and utility of legislation.").

In summary, we conclude that the Florida Act does not discriminate against interstate commerce, nor does it impose a burden on interstate commerce that is

19

clearly excessive when compared with the law's putative local benefits. Hence, we conclude that the Florida Act does not violate the dormant Commerce Clause.

C. Substantive due process

We note that Count III of Appellants' amended complaint alleges only that the Florida Act violates "substantive due process," making no reference to equal protection. [R. 67 at 12–13 (alleging that because the Florida Act targets innocent business activity, it is arbitrary and capricious and lacks a rational basis).] Florida sought summary judgment on Count III and argued in terms of equal protection—not substantive due process—to which Appellants responded, also arguing in terms of equal protection. The district court then addressed substantive due process and equal protection together because the rational basis standard applies to both types of claims. *See In re Wood*, 866 F.2d 1367, 1371 (11th Cir. 1989). However, a substantive due process claim differs from an equal protection claim, and it appears that Appellants pled only that the Act violated their rights to due process. Presumably, the district court addressed equal protection because the parties argued it without pleading it. In any case, it makes no difference in our analysis because Appellants' substantive due process claim fails to survive rational basis scrutiny, and an equal protection claim would as well.

When a challenged law does not infringe upon a fundamental right, we review substantive due process challenges under the rational basis standard. *See Locke v. Shore*, 634 F.3d 1185, 1195–96 (11th Cir. 2011). Under the rational basis standard, the law requires only that the Florida Act's prohibition on physician self-referrals be rationally related to the Florida Legislature's goal of reducing conflicts of interest, lowering health care costs, and improving the quality of health care services. *See Clover Leaf*, 449 U.S. at 462–63, 101 S. Ct. at 722–23. The Act will be upheld so long as "there is any reasonably conceivable state of facts that could provide a rational basis for [the regulation]." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15, 113 S. Ct. 2096, 2101–02 (1993). Appellants bear the burden of demonstrating that the law lacks a rational basis. *Deen v. Egleston*, 597 F.3d 1223, 1230 (11th Cir. 2010). We agree with the district court that the Florida Act passes rational basis-scrutiny because, no matter how ineffective the law might actually be, it was not irrational for the Florida Legislature to conclude that the amendments to the law would accomplish the legislative objectives identified in FLA. STAT. § 456.053(2).

In their brief, Appellants assert that the Florida Legislature's refusal to acknowledge the findings of the 2001 House committee report shows that it was irrational to amend the Florida Act in 2002 to remove the ESRD exemption.

21

Further, they argue that "the circumstances surrounding passage of the 2002 Amendments lead to no conclusion other than that the Florida Legislature was motivated to benefit a politically favored in-state provider." Appellants' Br. at 42.

But Appellants' arguments miss the mark of a rational basis inquiry. Their evidence casts doubt on the wisdom of the statute and suggests that perhaps a competitor out-lobbied Appellants before the Florida Legislature, but the evidence does not demonstrate that the Florida Legislature could not have possibly believed that removing the ESRD exemption would reduce conflicts and improve health care in the renal-dialysis field. Appellants fail to convince the court that the purported reasons given for the enactment of the law "'could not reasonably be conceived to be true by the governmental decisionmaker.'" *Clover Leaf*, 449 U.S. at 464, 101 S. Ct. at 724 (quoting *Vance v. Bradley*, 440 U.S. 93, 111, 99 S. Ct. 939, 949 (1979)). Because it is reasonably conceivable that Florida ESRD patients would be better served if their physicians were prohibited from making self-referrals to associated laboratories, we conclude that the Florida Act survives rational basis scrutiny and that the law does not deprive Appellants of their rights to substantive due process.

IV.

22

In conclusion, because we are persuaded that the district court properly granted Florida's motion for summary judgment on Appellants' preemption, dormant Commerce Clause, and substantive due process claims, we affirm its judgment.

**AFFIRMED.**