[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11401
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-22304-MGC

AMERIJET INTERNATIONAL, INC.,
a Florida corporation,

Plaintiff - Appellant,

versus

MIAMI-DADE COUNTY, FLORIDA,
a political subdivision of the State of Florida,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 21, 2015)

Before JORDAN, JULIE CARNES, Circuit Judges, and GOLDBERG,[*] District Judge.

PER CURIAM:

Long before the current debate on minimum wage began, Miami-Dade County joined a growing number of municipalities in the country by enacting a "living wage" ordinance.  Such laws typically require city or county contractors to pay their employees wages that are often higher than the applicable federal or state minimum rates, and are designed to help workers meet their basic needs – such as food, shelter, and medical care – without reliance on government programs.  In this appeal brought by Amerijet International Inc., we are asked to decide whether a section of the County's Living Wage Ordinance, MIAMI-DADE CODE OF ORDINANCES ch. 2, art. I, § 2-8.9(f)(2)(A), as applied to air carriers, is preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) or is unconstitutional under the Constitution's dormant Commerce Clause and Equal Protection Clause. We conclude that the LWO is not preempted, and that it is constitutional.

# I

## A

The County enacted the LWO in 1999 to promote the creation of full-time, permanent jobs that would pay Miami-Dade residents a sustainable wage and

---

[*]Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

thereby ease the burden on local taxpayers who would otherwise be required to pay for social services.  By its terms, the LWO requires service contractors (certain individuals or entities that conduct business with the County or that use the facilities of Miami International Airport ("MIA")) to pay a "living wage" to all employees who perform "covered services."[1]

The County sets the living wage rate annually, and that wage is typically higher than the state and federal minimum rates.  In addition to setting a higher wage floor, the LWO also imposes several administrative duties on covered service contractors.  For instance, such contractors must maintain records for all employees who provide covered services, including basic employment information such as (1) the names and addresses of employees; (2) job titles and classifications; (3) the daily number of hours worked by employees; (4) the gross wages earned by

---

[1] "Covered services," in part, are defined as:

> Guiding aircraft in and out of Airport; aircraft loading and unloading positions, designated by the Aviation Department; placing in position and operating passenger, baggage and cargo loading and unloading devices, as required for the safe and efficient loading and unloading of passengers, baggage and cargo to and from aircraft; performing such loading and unloading; providing aircraft utility services, such as air start and cabin air; fueling; catering; towing aircraft; cleaning of aircraft; delivering cargo, baggage and mail to and from aircraft to and from locations at any Miami-Dade County Aviation Department facility; and providing such other ramp services approved in writing by the Aviation Department[.]

LWO, § 2-8.9(F)(2)(A).

employees and any deductions made; and (5) social security returns and any payments to employees for fringe benefits. The records must be kept for a minimum of three years from the suspension, expiration, or termination of the service contractor's agreement with the County. Contractors must also submit, semi-annually, a certified payroll showing earning records for each employee and an employment activity report containing the race, gender, wages, and zip code of any employees who are hired or terminated.

**B**

Amerijet is an air carrier which has received a certificate from the United States Department of Transportation, as provided in 14 C.F.R. Part 121. It is a small all-cargo airline (that is, it only carries property and mail) that services the United States, the Caribbean, and Latin America.

In 2005, Amerijet expanded its operations to include a variety of other services, generally referred to as cargo and ground handling services ("cargo handling services"). Such services largely consist of the loading, unloading, and delivery of cargo for other airlines. In 2010, Amerijet executed a lease with the County, the owner and operator of MIA, for warehouse space to regularly provide such cargo handling services at the airport. The lease contained a provision requiring Amerijet to comply with all of the County's applicable ordinances, including the LWO.

4

On June 7, 2010, Miami-Dade's Department of Small Business Development ("SBD") sent a request for information to Amerijet, advising the carrier that it had initiated an investigation into alleged violations of the LWO. The investigation was the result of a complaint filed by one of Amerijet's employees alleging that the carrier had begun to provide cargo services for British Airways and other airlines without paying the requisite living wage rate. The SBD informed Amerijet that such cargo handling was a "covered service" under the LWO and advised the carrier that "Amerijet employees providing th[e] service on behalf of Amerijet for other airlines are covered by the living wage and must be paid accordingly." D.E. 50-2 at 17.

In response to the SBD's communication, Amerijet inquired as to whether the LWO applied to air carriers. Although Amerijet agreed that cargo handling was a covered service under the LWO, the airline was under the impression that the LWO did not apply to it. Apparently, Amerijet believed that the LWO only applied to covered service contractors who were not air carriers. After much back and forth with the SBD, and without a favorable resolution, Amerijet determined that it was not financially feasible to pay its cargo handling employees the living wage rate. On April 29, 2011, Amerijet outsourced its cargo handling services for other airlines to an on-airport cargo service contractor and laid off its in-warehouse cargo handlers.

5

Subsequently, some of Amerijet's former employees filed suit in state court for back pay and penalties under the LWO.  Amerijet settled that action, but not before it filed the instant suit against the County for declaratory and injunctive relief.

Amerijet's amended complaint alleged that the LWO was preempted by the ADA, 49 U.S.C. § 41713(b)(1); the Federal Aviation Administration Authorization Act, 49 U.S.C. § 14501(c)(1) ("FAAAA"); the Transportation Security Administration's regulations; 49 C.F.R §§ 15.5 and 1520.5; and certain Open Skies Agreements.  The complaint further alleged that the LWO violated the dormant Commerce Clause and the Equal Protection Clause of the Constitution, and asserted state law claims under the Florida Constitution and the County's Home Rule Charter.  The County filed a motion to dismiss, arguing that Amerijet lacked standing to bring its claims.  The parties then filed cross motions for summary judgment.  In an omnibus order, the district court ruled that Amerijet had standing, but found no federal impediment to the County's application of the LWO to the cargo handling services that Amerijet performed for other airlines.  The district court granted summary judgment in favor of the County on all the federal claims and dismissed Amerijet's state law claims, deciding not to exercise supplemental jurisdiction.  *See* 28 U.S.C. § 1367(c).

6

Amerijet appeals the district court's order on the following grounds: (1) the district court incorrectly ruled that the ADA and the FAAAA do not preempt the LWO; (2) the district court erred in concluding that the LWO did not unduly burden interstate and international commerce; (3) the district court failed to recognize that there are genuine issues of material fact as to whether the County enforced the LWO against other similarly-situated airlines; and (4) the district court erred in declining to rule on Amerijet's state law claims.  We address each argument in turn.

## II

We exercise plenary review with respect to the district court's grant of summary judgment.  *See Doe v. Drummond Co., Inc.*, 782 F.3d 576 (11th Cir. 2015).  "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law." *Fla. Transp. Serv., Inc. v. Miami-Dade Cnty. (FTS)*, 703 F.3d 1230, 1243 (11th Cir. 2012) (citations omitted).  "We also review *de novo* the constitutionality of a challenged statute." *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013).

## III

We will first consider Amerijet's argument that the LWO is preempted by the ADA and the FAAAA. We agree with the district court, albeit for different reasons, that the LWO is not preempted.

In 1978, Congress enacted the ADA, which largely deregulated domestic air transport. *See Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1343 (11th Cir. 2005). "To ensure that the States would not undo federal deregulation with regulation of their own," the ADA included a preemption clause. *Morales v. Trans World Airlines Inc.*, 504 U.S. 374, 378 (1992). In relevant part, that clause prohibits states or their political subdivisions from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law *related to* a price, route, or service of an air carrier that may provide air transportation under [the ADA]." 49 U.S.C. § 41713(b)(1) (emphasis added).

The term "related to" has a "broad scope" and an "expansive sweep." *Morales*, 504 U.S. at 384. Consequently, the Supreme Court has held that "a claim 'relat[es] to rates, routes, or services,' within the meaning of the ADA, if the claim 'ha[s] *a connection with, or reference to*'" the rates, routes, or services of an air carrier. *Northwest, Inc. v. Ginsberg*, 134 S.Ct. 1422, 1428 (2014) (emphasis added and citations omitted). Amerijet claims that § 2-8.9(F)(2)(A) of the LWO

8

impermissibly references, and has a forbidden connection with, air carriers' services and is therefore preempted by the ADA.[2]

## A

At first glance, it may seem that the ADA's broad scope preempts the application of this subsection of the LWO to Amerijet. Amerijet is a certificated air carrier, and cargo handling is a service that Amerijet provides. "Were this the true extent of the . . . wage law's reach, [Amerijet's] 'reference to' argument might be more persuasive." *Cal. Div. of Lab. Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325-26 (1997). But a closer look reveals something altogether different.

As an initial matter, we note that the LWO is not targeted at, and does not single out, airlines or carriers such as Amerijet. It applies to those entities which have certain contracts worth over $100,000 with the County, as well as numerous service contractors at MIA or the Aviation Department. *See* LWO, § 2-8.9(F). Thus, the LWO resembles a law of general application, as opposed to a law that is designed to regulate the airline industry.

In addition, the "services" at issue in this case—the provision of cargo handling services for other airlines—are not the type that implicate the ADA's

_____

[2] To the extent that Amerijet is basing its preemption argument on the FAAAA, that contention is the same as its preemption argument under the ADA. As Amerijet acknowledges in its brief, the FAAAA did not substantively change the ADA with respect to air carriers. We therefore do not address the FAAAA separately.

preemption provision. In *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248 (11th Cir. 2003), a "connection with" case, we adopted the Fifth Circuit's definition of the term "service" in § 41713(b)(1) of the ADA, as articulated in *Hodges v. Delta Airlines Inc.*, 44 F.3d 334 (5th Cir. 1995) (en banc). We held that the word "services" refers to "the elements of air travel that are bargained for by *passengers [or shippers]* with air carriers." *Branche*, 342 F.3d at 1258 (emphasis added). The term encompasses "not only the physical transportation of passengers [or shipments], but also the incidents of that transportation over which air carriers compete[,]" such as "ticketing, boarding procedures, provision of food and drink, and baggage handling[.]" *Id.* at 1257-1259. *See also id.* at 1258 ("those elements of air carrier operations over which airlines do not compete are not 'services' within the meaning of the ADA's preemption provision").

Recognizing that the term "service" could include many facets of an air carrier's operations, we emphasized that the bargained-for aspect of the definition "largely mitigate[d] the concern with overexpanding the reach of the ADA's preemption provision." *Id.* at 1258. We also noted that this limiting principle was "perfectly consistent with the ADA's purpose of promoting competition within the airline industry [because] air carriers compete in only a limited range of contexts, e.g., fares, routes, timing, etc., which constitute the bargained-for elements of its service." *Id.* at 1255-56.

10

Accordingly, three elements must be present for a particular service to be deemed a "service" for purposes of the ADA: (1) it must fit within the limited range of services over which airlines compete; (2) it must be bargained for; and (3) the bargained-for exchange must be between an air carrier and its consumers. *Id.* at 1255-56. Applying these concepts, we held in *Branche* that the ADA did not preempt a state-law retaliatory discharge claim brought by an ex-employee of an airline. *See id.* at 1259 (explaining that such a claim "cannot be said to relate in any meaningful way to the transportation of passengers from one location to another").

Amerijet, pointing to the fact that in *Hodges* the Fifth Circuit expressly included baggage handling as a "service," argues that its cargo handling for other airlines clearly satisfies that definition. But cargo handling, when performed by one airline for another (as is the case here), fatally lacks the third factor articulated in *Branche*. Any negotiations regarding such cargo handling occur between Amerijet and other airlines and do not in any way involve the "airline-consumer" or "airline-end user relationship."[3]

---

[3] Notably, in crafting the definition of "service" in *Branche*, we focused exclusively on the contractual relationship between an air carrier and the ultimate consumer or end user of that air carrier's services. *See Branche*, 342 F.3d at 1258-59. *See also Hodges*, 44 F.3d at 337 ("The Federal Aviation Agency . . . identif[ies] 'service' or 'services' in its regulations to incorporate the accoutrements of the passenger – or shipper – and carrier contract."). Our understanding is in accordance with the interpretation of ADA preemption by the Civil Aeronautics Board (the predecessor to the DOT): "[W]e conclude that preemption extends to all of the economic factors that go into the provision of the *quid pro quo for passenger's fares*." Civil Aeronautics Board,

11

Indeed, the County has never construed the LWO as applying to an airline when it handles cargo for its own consumers, and has consistently stated that the LWO is not applicable in such circumstances. The County has interpreted the LWO in this manner in several communications to Amerijet, and we accept the County's interpretation of the ordinance. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating the [Appellant's] facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."). We note, as well, that the County interpreted the LWO in this manner prior to initiating the enforcement proceeding against Amerijet and before Amerijet filed the instant action.

We acknowledge that Amerijet provides cargo handling services for other airlines, such as British Airways, which ultimately will offer those services to consumers. It cannot be said, however, that the provision of such services implicates the carrier-end user relationship. Amerijet's arrangement with other airlines is more akin to that of a subcontractor and a general contractor, and a contract between such parties would be secondary (and thus wholly separate and

---

*Implementation of Preemption Provision of the Airline Deregulation Act of 1978*, 44 Fed. Reg. 9951 (Feb. 15, 1979) (emphasis added). Although the DOT, some 24 years later, removed the CAB's interim policy, the DOT's current view on the issue is consistent with the CAB's. *See* Department of Transportation, *Preemption in Air Transportation*, *Policy Statement Amendment*, 68 Fed. Reg. 43882 (July 24, 2003).

distinct) to any contract with the ultimate consumer. *See* Webster's New World College Dictionary 1425 (4th ed. 2000) (defining subcontractor as "a person or company who assumes by secondary contract some or all of the obligations of the original contractor"); Black's Law Dictionary 373 (9th ed. 2009) (defining subcontract as "a secondary contract made by a party to the primary contract for carrying out the primary contract, or a part of it"). *Cf. New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins., Co.,* 514 U.S. 645, 649, 656 (1995) (holding that a statute imposing a surcharge on "[p]atients served by commercial insurers providing in-patient hospital coverage on an expense-incurred basis, by self-insured funds directly reimbursing hospitals, and by certain workers' compensation, volunteer firefighters' benefit, ambulance workers' benefit, and no-fault motor vehicle insurance funds" . . . "cannot be said to make 'reference to' ERISA plans in any manner" because the surcharge applied "regardless of whether the commercial coverage or membership, respectively, [wa]s ultimately secured by an ERISA plan, private purchase, or otherwise").

In sum, the cargo handling work Amerijet performs for other airlines at MIA does not constitute a "service" within the meaning of the ADA's preemption provision. We therefore affirm the district court's ruling that the LWO, as applied to such cargo handling services, is not preempted by the ADA.

13

**B**

The ADA's preemptive scope is broad enough to invalidate a statute even when it does not explicitly reference an air carrier's services. *See Morales*, 504 U.S. at 386 (A "state law may 'relate to' a [service], and thereby be pre-empted, even if the law is not specifically designed to affect such [services], or the effect is only indirect.") (citations omitted). A law that has a "significant impact" on the services of an air carrier might also be preempted, but we must be careful not to extend the ADA's preemptive reach to state laws that are "too tenuous, remote, or peripheral . . . to have pre-emptive effect." *Am. Airlines Inc. v. Wolens*, 513 U.S. 219, 224 (1995) (citations omitted).

Amerijet argues that the LWO has a significant impact on air carriers' services in two ways. First, Amerijet says that the LWO's recordkeeping, inspection, and reporting requirements create a substantial burden in the form of additional labor and costs. Second, Amerijet argues that the LWO alters the manner in which it provides services by compelling it to undertake the "infeasible" task of segregating its workforce into two groups—employees who handle cargo transported by Amerijet and employees who handle cargo for other airlines.

In making these arguments, Amerijet places great reliance on *Metropolitan Milwaukee Association of Commerce v. Milwaukee County*, 431 F.3d 277 (7th Cir.

14

2005), and *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 (2008). Those cases, however, are distinguishable on their facts.

Starting with *Milwaukee County*, that case did not involve the ADA's preemption clause. Instead, it examined whether the National Labor Relations Act, 29 U.S.C. § 151, *et. seq.*, preempted a county ordinance that required contractors to negotiate "labor peace agreements" with any union that desired to organize. *Milwaukee Cnty.*, 431 F.3d at 277-78. The case, therefore, is not of much help here.

Turning to *Rowe,* the LWO does not have the sort of significant effect on an air carrier's services contemplated in that case. There, several transport motor carriers alleged that the FAAAA (as applied to motor carriers) preempted a Maine law that effectively required such carriers to provide a "special kind of *recipient-verification* service" if they delivered tobacco within the state. *Rowe*, 552 U.S. at 368. The Supreme Court held that the requirement significantly and adversely impacted the carrier's services because it required them "to offer a system of services that the market d[id] not [then] provide (and which the carriers would [have] prefer[red] not to offer)." *Id.* at 372. The Court further found that the law would "freeze into place services that carriers might prefer to discontinue in the future." *Id*. In essence, the state law "produce[d] the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental

15

commands for 'competitive market forces' in determining (to a significant degree) the services that . . . carriers will provide." *Id.* (citations omitted).

The LWO, however, has no such effect. It does not interfere with competitive market forces by dictating the types of services Amerijet (or any other carrier) must provide. Nor does it prevent a carrier from providing cargo handling services, as Amerijet contends. If Amerijet's argument is that the LWO precludes an air carrier, in its capacity as a covered service contractor, from providing cargo handling services to other airlines, we have already concluded that such services do not trigger ADA preemption. If, on the other hand, Amerijet is suggesting that an increase in an air carrier's costs will in turn raise the prices of that carrier's services (i.e., an increase in baggage handling fees), such "indirect economic influences" are insufficient to trigger preemption. *See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 659-660 (1995) (holding that a statute that applied a surcharge on certain commercial insurance plans only indirectly influenced insurance buyers because it did not "bind plan administrators to any particular choice and thus [did not] function as a regulation of the ERISA plan itself.").

The LWO's requirements do not "bind" air carriers to "any particular choice and thus function as a regulation of [air carriers' services] . . . Nor does the indirect influence of the [ordinance's requirements] preclude" air carriers from

16

offering services that they wish to provide. *Id.*  The LWO merely "alters the incentives" facing an air carrier. *Dillingham*, 519 U.S. at 334.  "In this regard, it is 'no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate.'" *Id.*

Moreover, there is nothing prohibitive about requiring Amerijet to pay a portion of its workforce a different wage.  Employers routinely pay their employees different wage rates, even to those whose duties fall within the same job description.  Because any effect the LWO may have on an air carrier's services would be no more than indirect, remote, and tenuous, we conclude that the ordinance does not have the requisite "significant impact" to bring it within the ambit of the ADA's preemption clause.[4]

## III

The Commerce Clause endows Congress with the power to regulate commerce among the several states.  U.S. Const. Art. 1, § 8., cl. 3.  It is well settled, though, that the Commerce Clause also "serves as 'a substantive restriction on permissible state regulation of interstate commerce.'"  *Bainbridge v. Turner*,

---

[4] Our ruling is consistent with the decision of the Ninth Circuit rejecting ADA or FAAAA preemption claims with respect to a local living wage ordinance. *See Californians For Safe & Competitive Dump Truck Transp. v. Mendoca*, 152 F.3d 1184, 1189 (9th Cir. 1998). *See also S.C. Johnson & Son, Inc. v. Transport Corp. of Am., Inc.*, 697 F.3d 544, 558 (7th Cir. 2012) ("no one thinks that the ADA or the FAAAA preempts" background laws such as minimum wage laws); *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 87 (1st Cir. 2011) ("the Supreme Court would be unlikely—with some possible qualifications—to free airlines from . . . prevailing wage laws . . . applicable to other businesses").

17

311 F.3d 1104, 1108 (11th Cir. 2002).  "This 'negative' [or dormant] aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Id.* (citations omitted).  "The clause also works to keep states from 'ventur[ing] excessively into the regulation of . . . [interstate] commerce . . . [and] trespass[ing] upon national interests[.]'" *Id.* (modifications in original).

We examine challenges under the dormant Commerce Clause using a two-tiered analysis.  We first determine whether a law "'directly regulates or discriminates against interstate commerce,' or has the effect of favoring 'in-state economic interests[.]'"  *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 846 (11th Cir. 2008).  If it does, the law would be *per se* invalid unless it "'advance[s] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'"  *Id*.  A nondiscriminatory law, however, can also violate the dormant Commerce Clause.  Thus, under the second tier, we apply the so-called undue burden test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), to determine whether the state's interest in enacting the law "'is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.'"  *Islamorada*, 542 F.3d at 846 (citations omitted).  "There is, however, no clear line between these two strands of analysis, and several cases that have purported to apply the undue burden test (including *Pike* itself) arguably

18

turned in whole or in part on the discriminatory character of the challenged state regulations."   *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 n. 12 (1997) (citations omitted).

Amerijet primarily bases its arguments on the second tier of this analysis.  It contends that the County's sole purpose in applying the LWO to air carriers is to protect incumbent covered non-airline service contractors, such as general aviation service providers ("GASPers") which only provide general aviation services and do not engage in airline operations, from competition from out-of-state airlines. Amerijet argues that, under our decision in *Florida Transportation Services v. Miami Dade County*, 703 F.3d 1230 (11th Cir. 2012), this protectionist purpose warrants an invalidation of the LWO.

In *FTS*, we had occasion to consider whether Miami-Dade County's stevedore permit ordinance, as applied, violated the dormant Commerce Clause. Florida Transportation filed suit against the County, alleging that the Miami-Dade Port Director applied the ordinance in a manner that was designed to protect incumbent stevedores from competition by keeping new entrants out of the stevedore market.  703 F.3d at 1234.  FTS complained that the Port Director did not observe the ordinance's requirements but instead "automatically renew[ed] permits for all existing stevedore permit holders at the Port and automatically den[ied] all new applicants[.]"  *Id.*

19

The Port Director, in prior litigation with FTS, conceded the point, and argued that the practice was intended "to prevent 'economic hardship to the entire local stevedoring industry' that would result from 'dilut[ing] the market' with excessive stevedore permits." *Id.* at 1258. We concluded that the practices served a protectionist purpose and "plainly burdened interstate commerce" because they effectively kept new participants from entering into the stevedore market. *Id.* at 1257-1260.[5]

Unlike Florida Transportation in *FTS*, Amerijet has failed to demonstrate that the County's underlying motivation in enacting the LWO was protectionist. The County has not conceded that it enacted the ordinance to protect the local market. To the contrary, it asserts that the LWO's purpose is to prevent an undue burden on taxpayers by eliminating the need to subsidize social programs. Amerijet has not proven otherwise. The only evidence proffered by Amerijet to support its assertion is a memorandum explaining the County's reasons for adopting Resolution No. R-1180-95—a policy that is wholly separate and distinct from the LWO. As we explain, that evidence does not create an issue of fact.

In 1995, due to the increase in inter-airline marketing agreements and equity ownership arrangements, several airlines lobbied the Miami-Dade Aviation

---

[5] In FTS, "we recognize[d] that the terms "protectionist" and "protectionism" are narrowly defined in dormant Commerce Clause jurisprudence[,]" but "use[d] the terms broadly . . . as the permitting practice did not burden only out-of-state competitors."  *FTS*, 703 F.3d at 1257 n. 42.

20

Department to allow air carriers to provide cargo handling services to other airlines with which they had relationships. The Aviation Department agreed, so long as the airlines met certain conditions. Acknowledging that this change to the cargo policy would negatively impact the revenues of other covered service contractors such as GASPers, the County adopted Resolution No. R-1180-95 to eliminate a contractual provision from the GASPers permits that required workforces to consist of no less than 80% of full-time employees. This was done to prevent GASPers from suffering "a competitive disadvantage to airlines that w[ould] be able to provide [cargo handling] services without such a restriction." D.E. 45-2 at 13.

We find nothing inherently discriminatory regarding the adoption of Resolution R-1150-95, as it only authorized GASPers to compete on the same terms as airlines that were entering into the cargo handling market. Indeed, we have stressed that there is "no cause for constitutional concern" when "in-state and out-of-state [providers] are allowed to compete freely on a level playing field." *S. Waste Sys., LLC. v. City of Delray Beach, Fla.*, 420 F.3d 1288, 1291 (11th Cir. 2005).

Alternatively, Amerijet argues that, if we decline to grant it summary judgment on its dormant Commerce Clause claim, we should also deny the County's cross motion. It contends that there is a genuine issue of material fact

21

because the County failed to put forth any evidence to support its contention that the stated purpose of the LWO was sincere.  But Amerijet misunderstands the mechanics of a summary judgment motion.

When the nonmoving party bears the burden of proof at trial, the moving party may discharge its burden on a summary judgment motion "by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Under the *Pike* undue burden test, "[t]he burden to show discrimination rests on the party challenging the validity of the statute[.]"  *Hughes v. Okla.*, 441 U.S. 322, 336 (1979).  It is only "[w]hen discrimination against commerce . . . is demonstrated, [that] the burden falls on the [government entity] to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake."  *Id*.  The County has satisfied its burden, but Amerijet has not satisfied its burden.  We therefore conclude that the district court properly granted summary judgment on behalf of the County.[6]

---

[6]  In its reply brief, Amerijet for the first time asserts that the LWO is also facially discriminative.  This Court, however, "repeatedly has refused to consider issues raised for the first time in an appellant's reply brief."  *United States v.* Levy, 379 F.3d 1241, 1244 (11th Cir. 2004).  Therefore, we decline to address this argument.

IV

As its final challenge to the LWO, Amerijet asserts a "class of one" equal protection argument.  Specifically, Amerijet claims that it was not treated equally because Centurion Air Cargo, another airline service contractor, was subject to the LWO but was not required to comply with the LWO's dictates.  To be successful on this claim, Amerijet has to show "(1) that [it] was treated differently from other similarly situated [covered airline service contractors] and (2) that [the County] unequally applied [the] facially neutral ordinance for the purpose of discriminating against [it]."  *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (citations omitted).

In support of its equal protection claim, Amerijet submitted a brief email exchange between two county officials in 2007 and a letter dated February 5, 2008, from Centurion to the County.  The 2007 emails establish three things: (1) that the County received complaints that Centurion had not complied with the LWO; (2) that Centurion performed cargo services at the airport; and (3) that Centurion is an air carrier.  For its part, the 2008 letter simply informs the County that Centurion had begun performing cargo handling services for Alitalia Airlines.

Even considered in the light most favorable to Amerijet, these documents are insufficient to create a genuine issue of material fact as to whether the County enforced the LWO in a discriminatory manner.  First, the 2007 emails are silent as

to whether Centurion was providing cargo handling services for itself or for other airlines, making it unclear whether the LWO even applied to Centurion in 2007. Second, although the letter certainly acknowledges that Centurion began providing cargo handling services for Alitalia in 2008, there is no evidence that Centurion violated the LWO at that time. In addition, there is no mention one way or the other as to whether the County failed to enforce the LWO against Centurion once it was informed that the air carrier had begun to operate as a covered service contractor. As the district court correctly noted, one "can hardly infer that Centurion is exempt from complying with the LWO based upon [the] scant language" of the documents. D.E. 59 at 13.

Furthermore, the record is bereft of evidence showing that the County intentionally applied the LWO in an uneven manner for the purpose of discriminating against Amerijet. Accordingly, we conclude that the district court properly granted summary judgment in the County's favor.

## V

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the County and its denial of Amerijet's summary judgment motion.[7]

---

[7] We also affirm the district court's decision not to exercise supplemental jurisdiction over Amerijet's remaining state law claims. *See Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., LLC*, 596 F.3d 1313, 1328 (11th Cir. 2010) ("'We review the district court's decision not to

**AFFIRMED.**[8]

---

exercise supplemental jurisdiction for abuse of discretion.'  'As a practical matter, the district court is in the best position to weigh the competing interests . . . in deciding whether it is appropriate to exercise supplemental jurisdiction.'") (citations omitted).  Additionally, pursuant to Miami Dade County's request, we take judicial notice of the certified copy of the LWO, which includes its legislative findings.

[8] We grant Miami-Dade County's motion to take judicial notice of the certified copy of the LWO, which includes its legislative findings.