[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13577

_____

TIM RANDOLPH DANIELS,

                                        Plaintiff-Appellant,

*versus*

EXECUTIVE DIRECTOR OF THE FLORIDA
FISH AND WILDLIFE CONSERVATION COMMISSION,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:21-cv-10009-JEM

_____

Before Rosenbaum, Abudu, and Tjoflat, Circuit Judges.

Tjoflat, Circuit Judge:

This appeal concerns the entanglement of federal and state jurisdictions in the commercial fishing industry and the extent to which the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891(d), permits state regulation of fishing activities in federal waters.

Tim Daniels, a Florida-based commercial fisherman, challenges the constitutionality of regulations promulgated by Florida's Fish and Wildlife Conservation Commission. Those regulations restrict where and how Florida-registered fishing vessels may harvest the Florida pompano in federal waters in the Gulf of Mexico.[1] Daniels argued that federal law preempts any state regulations affecting fishing in federal waters and that Florida's regulations violate the Equal Protection Clause because they only restrict the activities of Florida-registered vessels. The District Court not only rejected Daniels's arguments at summary judgment, but also concluded that he lacked standing. He contests all three determinations on appeal.

Concluding that Daniels has standing but that the District Court did not err in granting summary judgment to the Executive

---

[1] On January 20, 2025, President Trump issued an executive order directing that "[t]he area formerly known as the Gulf of Mexico" be renamed as the "Gulf of America." Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025). Because the statutory schemes pertinent to this appeal explicitly refer to this geographic area as the "Gulf of Mexico," we continue to use that name.

23-13577              Opinion of the Court              3

Director of Florida's Fish and Wildlife Conservation Commission on the preemption and Equal Protection Clause claims, we affirm the District Court.

## I.

Tim Randolph Daniels is a commercial fisherman residing in Monroe County, Florida.  He has worked as a commercial fisherman his entire life, and captains two of the fishing vessels owned by his father's fishing business.  He targets lobster, stone crab, king mackerel, Spanish mackerel, bluefish, and pompano.  The crab and lobster are caught in Florida waters, but Daniels pursues everything else in the federal waters constituting the Exclusive Economic Zone (the "EEZ").[2]

Florida regulates commercial fishing in many ways.  The Florida Constitution created the Fish and Wildlife Conservation Commission (the "FWC"), for example, to "exercise regulatory and executive powers of the state with respect to marine life." Fla. Const. art. IV, § 9.  It does this by adopting rules, regulations, and orders in accordance with Florida's administrative procedures.

---

[2] The EEZ is a zone beyond the territorial sea but within 200 nautical miles of the United States coastal baseline.  Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983); *United States v. Alfonso*, 104 F.4th 815, 821 (11th Cir. 2024) (citing *United States v. Rioseco*, 845 F.2d 299, 300 n.1 (11th Cir. 1988)).  The United States has sovereign rights and control over living and non-living resources in the seabed, subsoil, and superjacent waters of this zone.  Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983).  Even though the United States has sovereign rights and jurisdiction in this zone, all nations can exercise certain high seas freedoms within the EEZ.  33 C.F.R. § 2.30.

Fla. Stat. § 379.1025. The FWC has thereby instituted regulations in Chapter 68B of the Florida Administrative Code concerning tens of marine species, from sponges and jellyfish to wahoo and dolphin.

The Florida pompano is one species regulated by the FWC. The FWC has declared pompano a restricted species which must be protected and conserved to assure its continuing health and abundance. Fla. Admin. Code Ann. r. 68B-35.001. Therefore, the FWC's rules affect how fishermen like Daniels may pursue pompano off the coast of Florida, including in the Gulf of Mexico EEZ. The harvest and possession of pompano of certain sizes is disallowed within and without state waters. *Id.* r. 68B-35.003(2). There are limits on the number of pompano that may be harvested and sold each day. *Id.* r. 68B-35.0035(2). And fishermen may neither harvest nor possess pompano with gill or entangling nets, subject to exceptions for fishermen in the EEZ who possess the requisite fishing licenses.[3] *Id.* r. 68B-35.004(4)–(5).

As part of these exceptions, the FWC has designated a portion of the Gulf of Mexico EEZ between Cape Sable and Hurricane Pass in Collier County as the Pompano Endorsement Zone (the "PEZ"), in which persons may simultaneously possess pompano and gill or entangling nets. *Id.* rr. 68B-35.002(10),

---

[3] A gill or entangling net is a form of netting which captures saltwater finfish by entangling their gills or other body parts in the meshes of the net. Fla. Admin. Code Ann. r. 68B-4.002(3), (5). Their use is generally banned in Florida waters. Fla. Const. art. X, § 16(b)(1).

68B-35.005(2).  And the use of gill or entangling nets is allowed within the PEZ for the harvest of pompano.  *Id*. r. 68B-35.005(3).  But a person must own a commercially registered vessel and possess a Vessel Saltwater Products License with a Restricted Species Endorsement in order to obtain the Pompano Endorsement that permits these exceptions.  *Id*. r. 68B-35.005(1).

On April 14, 2020, Daniels captained his father's Florida-registered fishing vessel into the Gulf of Mexico EEZ in pursuit of pompano.  FWC Officers Ryan Trueblood and Jessica Sutter were patrolling federal waters when they spotted Daniels and identified his crew culling through gill nets aboard the fishing vessel.  Trueblood contacted Daniels, who reported that they were targeting pompano using the nets.  Trueblood then boarded the fishing vessel to conduct a fisheries inspection.  At the end of his investigation, Trueblood explained that Daniels had been targeting pompano with gill or entangling nets outside the PEZ in violation of Florida law.  Trueblood then arrested and cited Daniels for harvesting or attempting to harvest pompano without state waters by use of impermissible gear in violation of Fla. Admin. Code Ann. r. 68B-35.004(4).

Daniels initially sued the FWC and the Executive Director of the FWC in his official capacity.  But after amendment of the complaint and discussion between the parties, the operative complaint named only the Executive Director in his official capacity as

the defendant.[4] The complaint sought injunctive and declaratory relief under 42 U.S.C. § 1983 on the basis that Florida's pompano regulations violate the Due Process, Equal Protection, Commerce, and Supremacy Clauses of the Federal Constitution.

Following discovery, Daniels and the FWC cross-moved for summary judgment.[5] The District Court granted summary judgment for the FWC, concluding that Florida's pompano regulations do not violate the Privileges and Immunities Clause, the Supremacy Clause, the Commerce Clause, or the Equal Protection Clause. It also concluded that Daniels lacks standing. Daniels timely appeals.

On appeal, Daniels contends that the District Court erred in granting summary judgment for the FWC. He argues that he has standing to sue the FWC, federal law preempts Florida's pompano regulations, and the regulations violate the Fourteenth Amendment's Equal Protection Clause.[6] The FWC contends in response

---

[4] Eric Sutton was the original Executive Director whom Daniels named as defendant, but Dr. Thomas Eason was substituted in Sutton's place under Fed. R. Civ. P. 25(d). For ease of discussion, we refer hereinafter to Executive Director Eason, who is the defendant-appellee here, as the "FWC."

[5] In his motion for summary judgment, Daniels raised for the first time the claim that Florida's pompano regulations violate the Privileges and Immunities Clause. This claim was not raised in Daniels's complaint.

[6] In his civil appeal statement, Daniels also raised the issues of whether the District Court erred in denying his Privileges and Immunities Clause and Commerce Clause claims. But because Daniels does not "plainly and prominently" raise those issues on appeal, he has abandoned them.

that Daniels's claims are barred by the pertinent statute of limitations. We address each contention in turn, but we do not reach the issue of the statute of limitations because we conclude that the FWC is entitled to summary judgment on Daniels's preemption and Equal Protection Clause claims.

## II.

We review a district court's ruling on cross-motions for summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party on each motion. *Signor v. Safeco Ins. of Ill.*, 72 F.4th 1223, 1227 (11th Cir. 2023) (citing *James River Ins. v. Ultratec Special Effects, Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022)). Summary judgment is appropriate when a movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

We review *de novo* a district court's dismissal of a case for lack of standing. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1112 (11th Cir. 2021) (citing *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1268 (11th Cir. 2006)).

## III.

Daniels first argues that the District Court erred in concluding at summary judgment that he lacks standing. We agree.

---

*Sapuppo v. Allstate Floridians Ins.*, 739 F.3d 678, 680 (11th Cir. 2014) (internal quotation marks omitted).

We first address whether Daniels has properly pleaded injury in fact. We then consider whether his injury is fairly traceable to the FWC's challenged conduct and is likely to be redressed by a favorable judicial decision.

*A.*

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157, 134 S. Ct. 2334, 2341 (2014) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992)). To have standing, "a plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1303–04 (11th Cir. 2017) (en banc) (internal quotation marks omitted).

First, a plaintiff must demonstrate "injury in fact"—an invasion of a judicially cognizable interest which is concrete, particularized, and actual or imminent. *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019). This "injury requirement may be satisfied by establishing a realistic danger of sustaining direct injury as a result of [a] statute's operation or enforcement." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012) (internal quotation marks omitted). "A plaintiff may meet this

standard in any of three ways: '(1) [the plaintiff] was threatened with application of the statute; (2) application is likely; or (3) there is a credible threat of application.'" *Id.* at 1257–58 (alteration in original) (quoting *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1245 (11th Cir. 1998)).

A person who has "no fears of state prosecution except those that are imaginary or speculative, [is] not to be accepted as [an] appropriate plaintiff[]." *Younger v. Harris*, 401 U.S. 37, 42, 91 S. Ct. 746, 749 (1971). But at the same time, a plaintiff need not "expose himself to actual arrest or prosecution" to challenge a statute. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2309 (1979) (internal quotation marks omitted); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29, 127 S. Ct. 764, 772 (2007). Past prosecution may bear on whether there is a real and immediate threat of repeated injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660, 1665 (1983).

Here, Daniels alleges an injury in fact sufficient for standing. Daniels is a commercial fisherman who regularly fishes for pompano in federal waters. In so doing, he uses gill nets. To carry on his commercial fishing of pompano in federal waters he will continue to use such nets. But the regulatory scheme of Chapter 68B-35 of Florida's Administrative Code restricts fishermen like Daniels from using their gill nets in the Gulf of Mexico EEZ to catch pompano. Because Daniels can be prosecuted for targeting pompano with gill nets as part of his commercial endeavors, he faces a credible threat of prosecution sufficient to constitute an

injury in fact. *See Ga. Latino All. for Hum. Rts.*, 691 F.3d at 1256, 1258–59 (holding that an attorney's regular professional conduct subjected him to a credible threat of the application of criminal statutes, constituting an injury in fact sufficient for standing).

Indeed, the threat of arrest and prosecution for the violation of Florida's pompano laws is heightened by Daniels's prior prosecution by the state of Florida for the harvest of pompano outside state waters while using gill nets. *See Lyons*, 461 U.S. at 102, 103 S. Ct. at 1665 ("Past wrongs [are] evidence bearing on whether there is a real and immediate threat of repeated injury." (internal quotation marks omitted)). Daniels's prior prosecution for state-proscribed conduct indicates that his "concern with arrest" and prosecution under the Florida pompano rules is not "chimerical." *Driehaus*, 573 U.S. at 159, 134 S. Ct. at 2342 (internal quotation marks omitted). Rather, the circumstances under which Daniels was first arrested have not changed in any way that would invalidate the repeated application of the pompano rules to Daniels. *Cf. Golden v. Zwickler*, 394 U.S. 103, 109, 89 S. Ct. 956, 960 (1969). Prosecution of Daniels is therefore more than "remotely possible," *Babbitt*, 442 U.S. at 299, 99 S. Ct. at 2309, reinforcing our conclusion that Daniels pleads an injury in fact sufficient for standing.

*B.*

After properly alleging injury in fact, a plaintiff must show that his injury is "fairly traceable to the challenged conduct of the defendant" and is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547

23-13577                Opinion of the Court                11

(2016) (first citing *Lujan*, 504 U.S. at 560–61, 112 S. Ct. at 2130; and then citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 703–04 (2000)).

Daniels's injury—the threat of prosecution for targeting pompano in federal waters with gill nets—is directly traceable to the existence of Florida's pompano rules in Chapter 68B-35 of the Florida Administrative Code. Without those rules regulating the harvest, attempted harvest, and possession of pompano with gill nets in federal waters, Daniels would not face any threat of prosecution for his commercial conduct in federal waters. This satisfies standing's causation requirement. And because the pompano rules would not be enforced against Daniels if he were to succeed on any of his challenges to the suite of pompano rules in Chapter 68B-35, Daniels's injury can be redressed by this litigation.

The FWC's argument that Daniels lacks standing due to Florida's constitutional ban on gill net fishing is a red herring. To be sure, the Florida Constitution proclaims that "[n]o gill nets or other entangling nets shall be used in any Florida waters." Fla. Const. art. X, § 16(b)(1). And Florida law criminalizes the taking or attempted taking of marine life in Florida waters using netting inconsistent with this constitutional provision. Fla. Stat. § 379.2422. According to the FWC, these provisions obviate Daniels's standing as he would be unable to prove that his injury is solely traceable to the challenged pompano rules. The unchallenged prohibitions on using gill nets in Florida waters are, according to the FWC, "an independent source [that] would have caused [Daniels] to suffer the

same injury." *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012).

But the FWC misses the mark because the prohibitions in the Florida Constitution do not concern federal waters. Instead, they apply only to "Florida waters" which are "the waters of the Atlantic Ocean, the Gulf of Mexico, the Straits of Florida, and any other bodies of water under the jurisdiction of the State of Florida." Fla. Const. art. X, § 16(c)(4). The outer boundary in the Gulf of Mexico is 3.45 nautical miles from the coastline; "[a]ll Florida waters inside this line are subject to the prohibitions of article X, section 16(b)(2) [of the Florida Constitution]." *State v. Kirvin*, 718 So. 2d 893, 901 (Fla. Dist. Ct. App. 1998), *review denied sub nom.*, *Taylor v. State*, 729 So. 2d 918 (Fla. 1999); *accord* Op. Att'y Gen. Fla. 95-51 (1995).

Daniels does not complain of any obstacles to his commercial harvest of pompano within Florida waters. Rather, he complains of restrictions affecting federal waters in the Gulf of Mexico and notes that the challenged administrative rules have nothing to do with pompano fishing in Florida territorial waters. The prohibitions which the FWC points to therefore cannot be an independent source of Daniels's injury, as he would face no sanction under those prohibitions for the harvest of pompano with gill nets outside Florida's waters. For the same reason, the unchallenged existence of these prohibitions does not obviate redressability.

The FWC also contends that Daniels does not adequately specify the relief which will redress his injury in fact or bring a

claim challenging the particular Florida Administrative Code section under which he was arrested.  But Daniels's complaint broadly identifies the targeted statutes as the FWC's various administrative rules that control the commercial harvest of pompano.  The complaint gives two examples "include[d]" in those regulations as Fla. Admin. Code Ann. rr. 68B-35.002(10) and 68B-35.005.  And the charging document attached to the complaint identifies r. 68B-35.004 as the statute under which Daniels was prosecuted.  The prayer for relief in Daniels's complaint then specifically requests an injunction of the "Florida Pompano Rules" which the FWC promulgates.  The redress which Daniels seeks can therefore be characterized as an injunction of all the rules promulgated by the FWC concerning commercial pompano fishing, including, but not limited to, the exemplars which Daniels's complaint identifies.  Moreover, the Supreme Court has rejected the argument that a request for relief was inadequately pleaded in circumstances when the plaintiff sought to enjoin the enforcement of regulations which were unidentified in the complaint but which the defendant understood were being challenged.  *See Turner v. City of Memphis*, 369 U.S. 350, 351–52, 82 S. Ct. 805, 806 (1962) (per curiam).  The FWC in their responsive filings plainly understood that Daniels was complaining of and challenging the commercial pompano regulations throughout Chapter 68B-35.

The FWC's contention that this relief is overbroad is well taken, as standing requires a remedy limited to the injury in fact which a plaintiff has established.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353, 126 S. Ct. 1854, 1868 (2006).  But whether the

injunctive relief sought by Daniels is properly tailored for purposes of judicial administration is an issue separate from the determination of standing. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (distinguishing the traceability and redressability requirements of standing from the proper scope of injunctive relief under Fed. R. Civ. P. 65). Standing only requires that it be likely that the injury in fact will be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136. Enjoining the enforcement of the various pompano restrictions promulgated by the FWC will alleviate the threat of sanction which Daniels faces for targeting pompano in federal waters. Accordingly, Daniels meets the redressability requirement for purposes of standing.

## IV.

Daniels next argues that the District Court erred in granting summary judgment for the FWC on Daniels's claim that federal law preempts Florida's pompano regulations. On appeal, he argues that the Magnuson-Stevens Act deprives Florida of any authority to regulate the activity of pompano fishing in federal waters. We disagree.

We first analyze the text, context, and legislative history of the Magnuson-Stevens Act. We then construe the statutory scheme to clarify the scope of permissible fishing vessel regulations allowed to the states under the Magnuson-Stevens Act.

### A.

"Federal preemption of state laws is a creature of the Supremacy Clause." *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224

23-13577          Opinion of the Court          15

(11th Cir. 2014) (citing U.S. Const. art. VI, cl. 2). Under the Supremacy Clause, the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Thus, where a federal law and a state law conflict, 'federal law trumps state law.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)).

Under the resulting doctrine of preemption, express preemption of state law occurs when Congress expressly displaces state law using the text of a federal statute. *See id.*; *Lawson-ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 916 (11th Cir. 2020) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 1309 (1977)). Implied preemption occurs "where there is a conflict with a congressional enactment or where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation in a particular area of law." *Lawson-ross*, 955 F.3d at 916 (internal quotation marks and citations omitted).

Two principles guide us in our preemption analysis. "First, the purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009) (internal quotation marks omitted). This is primarily "discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486, 116 S. Ct. 2240, 2250–51 (1996) (quoting *Gade v. Nat'l*

*Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111, 112 S. Ct. 2374, 2390 (1992) (Kennedy, J., concurring in part and concurring in the judgment)), *abrogated in part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 136 S. Ct. 1938 (2016). "Second, we assume that 'the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress.'" *Marrache*, 17 F.4th at 1095 (quoting *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939–40 (11th Cir. 2013)). But where "Congress has enacted an express-preemption provision, we identify the state law that it preempts according to ordinary principles of statutory interpretation, and no presumption against preemption applies." *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (citing *Franklin Cal. Tax-Free Tr.*, 579 U.S. at 125, 136 S. Ct. at 1946).

Daniels's first preemption argument arises from the text of the Magnuson-Stevens Act. The Magnuson-Stevens Fishery Conservation and Management Act establishes a federal framework for the conservation and management of the United States's coastal fishery resources. *See* 16 U.S.C. § 1801(b). Under the Magnuson-Stevens Act, the United States exercises "sovereign rights and exclusive fishery management authority over all fish, and . . . fishery resources within, the [EEZ]." *Id.* § 1811(a). To manage these resources, the Magnuson-Stevens Act creates eight Regional Fishery Management Councils, including the Gulf of Mexico Fishery Management Council that encompasses fisheries off the western coast of Florida. *Id.* § 1852(a)(1). This Council submits a fishery management plan for each fishery that it believes to require conservation and management. *Id.* § 1852(h)(1). These plans may limit or

even forbid fishing of certain fisheries or in certain zones. *Id.* § 1853.

The Magnuson-Stevens Act also allows a state to extraterritorially regulate fishing vessels registered under the law of the state when there is no fishery management plan or other applicable federal fishing regulations, or when the state's laws are consistent with an existing fishery management plan and other federal fishing regulations. *Id.* § 1856(a)(3)(A).

Daniels contends that Florida's pompano regulations are not within the scope of the Magnuson-Stevens Act's grant of extraterritorial jurisdiction. He concedes there is no current fishery management plan for pompano in the Gulf of Mexico EEZ. So, under 16 U.S.C. § 1856(a)(3)(A)(i), Florida has the power to regulate fishing vessels. But Daniels points out that the Magnuson-Stevens Act defines a "fishing vessel" as a "vessel, boat, ship, or other craft which is used for, equipped to be used for, or of a type which is normally used for (A) fishing; or (B) aiding or assisting one or more vessels at sea in the performance of any activity relating to fishing." *Id.* § 1802(18). Daniels argues that this extraterritorial jurisdiction over "fishing vessels" is distinct from any authority of the states to regulate the act of fishing itself.

To support his stance, Daniels highlights the Magnuson-Stevens Act's definition of a "fishery" as including the act of "fishing" for a stock of fish, *id.* § 1802(13), and its declaration that the United States has "sovereign rights and exclusive fishery management authority over all fish . . . within the exclusive economic zone,"

*id.* § 1811(a). Consequently, Daniels argues, there is a clear line between the permissible regulation of fishing vessels and the impermissible regulation of fishing. Because Florida's pompano rules regulate how fishermen like Daniels may target pompano in federal waters—that is, they affect the act of fishing—they are not permissible regulations of fishing vessels and are consequently preempted by the Magnuson-Stevens Act.

But Daniels's interpretation of the Magnuson-Stevens Act flounders because the language, structure, and context of § 1856(a) indicate that Congress did not intend to preempt state regulations that affect fishing activities. "We do not . . . construe statutory phrases in isolation . . . ." *United States v. Morton*, 467 U.S. 822, 828, 104 S. Ct. 2769, 2773 (1984). Rather, we must read a statute's words in their context and in view of the overall statutory scheme. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S. Ct. 1291, 1301 (2000). We therefore must read beyond the few phrases to which Daniels points when attempting to understand the intent of Congress in writing § 1856(a).

Most apparent, the full language of § 1856(a)(3) undermines Daniels's argument that the grant of regulatory authority over "fishing vessels" to the states lacks any relation to the fishing activities conducted by those vessels. Fishery management plans are centrally concerned with conserving and managing fish stocks. *See* 16 U.S.C. § 1853. It is in the absence of such plans for managing fish stocks, as well as in the absence of applicable "fishing regulations," that state regulations of fishing vessels are permitted to have

23-13577          Opinion of the Court          19

extraterritorial effect in the EEZ. *Id.* § 1856(a)(3)(A)(i). If state regulation of fishing vessels could not encompass the fishing-related activities of those vessels, as Daniels proposes, then Congress would have no reason to expressly tie state regulation to the absence of fishery management plans and federal fishing regulations. Otherwise, tying permissible state regulation to the absence of conflicting federal regulatory schemes would be meaningless, as Congress would never have intended for "fishing vessel" regulations to touch on activities affecting fish stocks or fishing activities; there would never be any conflict *ab initio*. To construe the statute as Daniels proposes would render portions of § 1856(a)(3) superfluous or insignificant, which we must avoid as a basic principle of statutory construction.[7] *See Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 970–71 (5th Cir. Apr. 1981).[8] Accordingly, when we read the words "fishing vessels" in their statutory context, it is

---

[7] This same reasoning extends to § 1856(a)(3)(A)(ii), which permits a state to extraterritorially regulate fishing vessels if those regulations are consistent with an existing fishery management plan and applicable federal fishing regulations. If Congress intended to preempt any state regulations that affect fishing activities in the EEZ and to only permit regulations of boats, the conditions of § 1856(a)(3)(A)(ii) would be rendered meaningless and insignificant. We must construe § 1856(a)(3) "so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009) (internal quotation marks omitted).

[8] This Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

clear that Congress did not intend § 1856(a)(3) to preclude any state regulation that affects the act of fishing.

The statutory definition of "fishing vessel" also indicates Congress did not intend to preempt state regulation of fishing activities because it only delegated authority over vessels to the states. A "fishing vessel" includes:

> [A]ny vessel, boat, ship, or other craft which is used for, equipped to be used for, or of a type which is normally used for--
>
> (A) fishing; or
>
> (B) aiding or assisting one or more vessels at sea in the performance of any activity relating to fishing, including, but not limited to, preparation, supply, storage, refrigeration, transportation, or processing.

16 U.S.C. § 1802(18). A state regulation covering a "fishing vessel" could consequently extend to the activities of vessels that aid or assist a separate ship in the performance of fishing because it is precisely that assistive conduct which makes the assisting vessel a "fishing vessel." In other words, Daniels's proposition that states cannot directly regulate fishing activities via the delegation of regulatory authority in § 1856(a)(3)(A) would produce the absurd result that states are allowed to regulate the activities of a vessel assisting in the performance of fishing but not the activities of the vessel actually engaged in fishing. Daniels offers no explanation for such a distinction even though "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever

possible." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S. Ct. 1534, 1538 (1982).

Further, the statutory definition of "fishing" indicates that Congress did not intend to sharply distinguish impermissible regulations of "fishing" and permissible regulations of "fishing vessels." Section 1802 defines "fishing" as "any operations at sea in support of, or in preparation for, any activity described" in the previous three subsections. 16 U.S.C. § 1802(16)(D). Those three subsections define fishing as the actual or attempted catching, taking, or harvesting of fish, or any activity reasonably expected to result in the catching, taking, or harvesting of fish. *Id.* § 1802(16)(A)–(C). Thus, "fishing" includes the activities of vessels that assist in fishing.

But, as we pointed out earlier, states are authorized to extraterritorially regulate "fishing vessels," which include vessels engaged in performing activities in assistance of fishing. Congress could not intend to preempt all state regulations affecting fishing while allowing state regulations of vessels that are performing activities that assist in fishing, because that assistance itself statutorily constitutes "fishing." If it did intend such preemption, it would not have defined "fishing vessels" and "fishing" as it did. To conclude otherwise would create a statutory scheme repugnant to itself, which we must avoid. *See New Lamp Chimney Co. v. Ansonia Brass & Copper Co.*, 91 U.S. (1 Otto) 656, 663 (1875) ("[I]n such a case the rule is, that repugnancy should, if practicable, be avoided . . . ."); *United States v. Turkette*, 452 U.S. 576, 580, 101 S. Ct. 2524, 2527 (1981)

("[I]nternal inconsistencies in the statute must be dealt with.") (first citing *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S. Ct. 2053, 2061 (1978); and then citing *Comm'r v. Brown*, 380 U.S. 563, 571, 85 S. Ct. 1162, 1166 (1965)).  We cannot agree with an interpretation which would create such a statutory scheme.

Finally, the legislative history of § 1856(a)(3) indicates that Congress did not intend to preempt all state regulations affecting fishing.  Section 1856 was amended by the Sustainable Fisheries Act of 1996.  *See* Sustainable Fisheries Act of 1996, Pub. L. No. 104-297, § 112, 110 Stat. 3559, 3595–97 (1996).  Originally, § 1856 provided that "the jurisdiction and authority of a State shall extend . . . to any pocket of waters that is adjacent to the State and totally enclosed" within the territorial sea of the United States, but that otherwise "a State may not directly or indirectly regulate any fishing vessel outside its boundaries, unless the vessel is registered under the law of that State." 16 U.S.C. § 1856(a) (1996).  The 1996 amendments altered this restrictive, excepting language and substituted it with an affirmation of a state's power to engage in extraterritorial regulation of fishing vessels.

The reasoning for this change highlighted that the preexisting text was "somewhat vague with respect to a State's authority to regulate its vessels," leading to "recent court challenges." S. Rep. No. 104-276, at 30 (1996), *as reprinted in* 1996 U.S.C.C.A.N. 4073, 4103.  The amendments were "intended to clarify the intent of section [1856(a)(3)] to allow a State to apply State regulations to fishing vessels registered in that State." *Id*.  This clarification was motivated by controversies in which fishermen, in violation of state

regulations, seized on perceived loopholes in the statutory scheme to fish in federal waters containing fisheries without fishery management plans. *See Hearing on the Reauthorization of the Magnuson Fishery Conservation and Management Act: Hearing on S.B. 39 Before the Subcomm. on Oceans & Fisheries of the S. Comm. on Com., Sci. & Transp.*, 104th Cong. 112 (1995) (statement of Kristin Stahl-Johnson, Member, Alaska Marine Conservation Council). One proposal to address this issue, which received considerable support around the country, was to extend state jurisdiction into the EEZ. *Hearing on the Reauthorization of the Magnuson Fishery Conservation and Management Act: Hearing on S.B. 39 Before the Subcomm. on Oceans & Fisheries of the S. Comm. on Com., Sci. & Transp.*, 104th Cong. 5 (1995) (statement of Rep. Gail Phillips, Speaker of the H., Alaska State Leg.). Thus, the amendment of § 1856 into its modern form was tightly linked to the ability of states to regulate the actual activities in which fishing vessels engaged; the legislative history of the 1996 amendments to the Magnuson-Stevens Act manifests no intent of Congress to expressly or impliedly preempt state regulations affecting these activities.

Statements from the amendment's sponsor reify our understanding of this legislative intent. Of course, the views of a bill's sponsor are not controlling as to the meaning of the legislation. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385, 132 S. Ct. 740, 752 (2012) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, 100 S. Ct. 2051, 2061 (1980)). But as a contemporaneous statement made by the legislator who worked on the statute, we find it helpful in clarifying legislative intent. *Curse v. Dir.,*

*Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 843 F.2d 456, 462 n.18 (11th Cir. 1988) (citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 534, 102 S. Ct. 1912, 1924 (1982)).  Thus, we note that two colloquies on the Senate floor involving the legislation's sponsor made clear that state jurisdiction over fishing vessels would permit a state to impose regulations on the vessels' fishing activities.  142 Cong. Rec. 23936 (1996) (colloquy of Sens. Olympia Snowe and Ted Stevens); 142 Cong. Rec. 23935–36 (colloquy of Sens. Bob Graham and Ted Stevens).  These colloquies underscore what we have concluded—§ 1856(a)(3)'s use of the term "fishing vessels" does not manifest an intent to preempt state regulation of fishing activities.

⋆     ⋆     ⋆

In sum, the text, context, and legislative history of 16 U.S.C. § 1856 militate against Daniels's argument that the states are preempted from promulgating regulations that affect fishing activities.  Rather, they indicate that Congress intended for states to permissibly regulate fishing vessels in ways that would affect fishing.[9]

---

[9] Daniels refers to this Court's discussion of preemption in *Southeastern Fisheries Ass'n v. Chiles*, 979 F.2d 1504 (11th Cir. 1992), to support his argument that the Magnuson-Stevens Act was intended to preempt any state fishing regulations.  In *Chiles*, however, we ultimately remanded for further factual findings and explicitly stated that "[w]e do not decide on appeal whether . . . [the statute] has been preempted."  979 F.2d at 1510.  Any comments on the preemptive force of the Magnuson-Stevens Act in *Chiles* are dicta that went "beyond the case" and therefore "ought not to control the judgment in a subsequent suit when the very point is presented for decision."  *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821); *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("All statements that go beyond the facts of the case . . . are dicta.  And dicta is not binding on anyone for any purpose." (citations

*B.*

Having concluded that Congress did not intend the Magnuson-Stevens Act to preempt state regulations that affect fishing, we must still address and clarify the overlap between "fishing" regulations and "fishing vessel" regulations. Even though Congress may have intended to permit states to extraterritorially regulate fishing vessels in ways that affect fishing, § 1811(a) plainly proclaims that the United States exercises sovereign and exclusive fishery management authority over all fish. When faced with such a clear conflict between the laws that Congress has enacted, it is our duty to resolve the tension and reconcile the statutes if possible. *See Lamirand v. Fay Servicing, LLC*, 38 F.4th 976, 978 (11th Cir. 2022) ("One of the duties of courts is to resolve conflicts between the statutes that Congress enacts.").

We find that we can read § 1856(a) and § 1811(a) in a manner that gives effect to each while preserving the sense and purpose of both statutes. *See Watt v. Alaska*, 451 U.S. 259, 267, 101 S. Ct. 1673, 1678 (1981) (first citing *Morton v. Mancari*, 417 U.S. 535, 551, 94 S. Ct. 2474, 2483 (1974); and then citing *Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S. Ct. 337, 339 (1940)). Section 1811(a) vests in the United States sovereign rights and fishery management authority over all fish within the EEZ, which—following the definition of "fishery" in § 1802(13)—includes the act of fishing for such stocks

---

omitted)). As Judge Cox recognized at the time, the discussion of the Magnuson-Stevens Act in *Chiles* constituted "tentative views" that were unnecessary for our judgment. *Chiles*, 979 F.2d at 1510 (Cox, J., concurring in the judgment).

of fish. "Fishing" encompasses many activities, from the actual or attempted harvesting of fish to any operations at sea in support of, or in preparation for, such harvests. 16 U.S.C. § 1802(16). By the plain language of the statute, "fishing" is not limited to the operation of a fishing vessel in pursuit of fish. Rather, it would include the operation of the fishing vessel, any operations at sea supporting the harvest of fish, and the activities of each individual on a fishing vessel who is involved in catching, taking, or harvesting fish. In short, § 1811(a) vests in the United States authority over everything related to the harvest of fish in the EEZ, including the individual activities of persons at sea irrespective of whether those persons operate or own a fishing vessel.

Section 1856(a) carves out and conditionally delegates authority to the states over a narrow portion of this all-encompassing authority. That delegated portion concerns only "fishing vessels," which is statutorily limited to vessels, boats, ships, or other crafts. 16 U.S.C. § 1802(18). Any state regulations under § 1856(a) must therefore act on the fishing vessel itself or require the operation of the fishing vessel as a nexus for the regulated conduct. Section 1856(a) is thus "an exception, though not so expressed, to the universality of the language of" § 1811(a). *United States v. Moore*, 95 U.S. 760, 763, 24 L. Ed. 588 (1877). "This obviates the difficulty, harmonizes the provisions, and gives effect to both." *Id.*

And, of course, the captain, owner, or operator of a ship may be held responsible for any state-regulated conduct of the ship. The authority vested in these positions has long allowed them to be "held personally responsible for any loss or injury that may happen

. . . through [their] negligence or misconduct." 1 Alfred Conkling, The Admiralty Jurisdiction, Law and Practice of the Courts of the United States: With an Appendix 429 (rev. corrected 2d ed. 1857). Consequently, when the master, operator, or owner of a fishing vessel directs or uses the ship to engage in state-regulated conduct in federal waters, sanctions may be effected against him. *See* Thomas J. Schoenbaum, Admiralty and Maritime Law § 3:12 (6th ed. 2024) ("If a violation of United States law is found [with the vessel] . . . the persons on board may be prosecuted in American courts.").

That states and municipalities have long been able to regulate vessels' conduct and thereby exact penalties, fees, fines, or sanctions from the owner or operator of the vessels supports this reading of § 1856(a). The Supreme Court, for instance, did not object to a state statute requiring vessels to have a licensed pilot, and entertained the possibility that such a statute could penally sanction the ship's master for failure to comply. *The China*, 74 U.S. 53, 53, 60 (1868). Nor did the Court question that a statutory, municipal wharfage enforced against vessels could be exacted from the ships' owners. *Keokuk N. Line Packet Co. v. City of Keokuk*, 95 U.S. (5 Otto) 80, 84–86 (1877). And the Court blessed the licensing of vessels for the navigation of the Chicago River, the fees for which would be exacted from the owners of the licensed vessels. *Harmon v. City of Chicago*, 147 U.S. 396, 404–05, 411–12, 13 S. Ct. 306, 308–09, 311–12 (1893). If the fees went unpaid, the municipal authority could subject the shipowners to punitive sanctions. *Id.*

Our determination, therefore, is that § 1856(a) allows Florida to regulate "fishing vessels" in a manner that affects fishing activities.  And § 1856(a)(3)(A)(i) specifically permits the regulation of the fishing vessel at issue here because it was registered under Florida law and there are no fishery management plans or other applicable federal fishing regulations covering pompano in the Gulf of Mexico EEZ.  The pompano regulations at bar all either act directly on fishing vessels or regulate conduct that requires the operation of a fishing vessel as a nexus for the conduct.  In enforcing these regulations, the FWC only sanctioned Daniels, the captain of the fishing vessel, rather than every individual aboard Daniels's vessel engaged in proscribed fishing activities.  Under our reading of the Magnuson-Stevens Act, Florida is not preempted from enforcing its pompano rules against Daniels in this manner.

## V.

Daniels next argues that the District Court erred in granting summary judgment for the FWC on his claim that Florida's pompano regulations violate the Equal Protection Clause of the Fourteenth Amendment.  He contends that the pompano regulations discriminatorily impose fishing restrictions on Florida-registered vessels in federal waters while allowing non-Florida-registered vessels to more extensively harvest pompano in federal waters.  We agree with the District Court that Florida's pompano regulations do not violate the Equal Protection Clause.

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection

Clause essentially directs "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S. Ct. 2382, 2394 (1982)). Accordingly, "[a]ll statutory classifications must, at a minimum, satisfy rational basis review." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1226 (11th Cir. 2023) (citing *Clark v. Jeter*, 486 U.S. 456, 461, 108 S. Ct. 1910, 1914 (1988)).

Daniels's argument immediately finds itself in troubled waters because it fails to identify any dissimilar treatment of persons within Florida's jurisdiction. The Fourteenth Amendment concerns a state's treatment of persons "within its jurisdiction." U.S. Const. amend. XIV, § 1. As the Supreme Court explains, "the Fourteenth Amendment was designed to afford its protection to all within the boundaries of a State." *Plyler*, 457 U.S. at 212, 102 S. Ct. at 2392 (citation omitted). At the same time, the Court recognizes that "the phrase 'within its jurisdiction' was intended in a broad sense to offer the guarantee of equal protection . . . *to all upon whom the State would impose the obligations of its laws*." *Id.* at 214, 102 S. Ct. at 2393 (emphasis added). In other words, a state's equal protection mandate "can be performed only where [the state's] laws operate, that is, within its own jurisdiction." *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350, 59 S. Ct. 232, 236 (1938).

Here, only Florida-registered vessels fall within the state's extraterritorial jurisdiction and are subject to the state's pompano rules. That is because 16 U.S.C. § 1856(a)(3)(A) allows a state to regulate fishing vessels "outside the boundaries" of the state when

"[t]he fishing vessel is registered under the law of that State." So, when a vessel is registered under Florida law and operates in federal waters, Florida's pompano regulations apply. Conversely, when a vessel is *not* registered under Florida law and operates in federal waters, the pompano regulations cannot apply.

Daniels correctly notes that non-Florida-registered vessels consequently escape the gill net and PEZ restrictions that burden Florida-registered vessels seeking pompano in federal waters. But that difference is a result of Congress's decision to extend the jurisdiction of the states into the EEZ based on vessel registration. Florida's pompano laws cannot operate against non-Florida-registered vessels in federal waters, so Florida's mandate of equal protection does not encompass those vessels. *See Missouri ex rel. Gaines*, 305 U.S. at 350, 59 S. Ct. at 236; *see also Dolley v. Abilene Nat'l Bank*, 179 F. 461, 463–64 (8th Cir. 1910) ("A most extraordinary condition would exist if the legislation of the states properly confined within its appropriate sphere were to be held invalid because it does not extend to and embrace objects beyond their jurisdiction."). As long as those vessels do not register in Florida, they will not be "within such jurisdiction" of the state for purposes of § 1856(a)(3) and the Equal Protection Clause. *Fire Ass'n of Phila. v. New York*, 119 U.S. 110, 120, 7 S. Ct. 108, 113 (1886); *see also Blake v. McClung*, 172 U.S. 239, 260–61, 19 S. Ct. 165, 173–74 (1898).

Even if we accepted Daniels's contention that the enforcement of Florida's pompano rules is discriminatory within the meaning of the Equal Protection Clause, the regulations would still

pass constitutional muster.  The regulations, *arguendo*, discriminate on the basis of the registration status of fishing vessels—Florida-registered vessels face greater restrictions on pompano fishing in federal waters than do non-Florida-registered vessels.  This discrimination does not involve a suspect class or a fundamental right, so the regulations must satisfy rational basis review. *Fresenius*, 704 F.3d at 944; *Eknes-Tucker*, 80 F.4th at 1226.  Rational basis review requires only that the classification be rationally related to a legitimate governmental purpose. *Clark*, 486 U.S. at 461, 108 S. Ct. at 1914.  And we will uphold a law "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993).

The purpose of Florida's pompano regulations is to conserve and manage pompano stock.  Fla. Admin. Code Ann. r. 68B-35.001(1).  That is a legitimate governmental purpose.  And Florida's inability under § 1856(a)(3) to regulate non-Florida-registered vessels in federal waters provides a reasonable ground for classification of fishing vessels on the basis of registration status. *See Packer Corp. v. Utah*, 285 U.S. 105, 110, 52 S. Ct. 273, 274 (1932) ("It is a reasonable ground of classification that the state has power to legislate with respect to persons in certain situations and not with respect to those in a different one.").  In tandem, then, the pompano regulations' targeting of Florida-registered vessels is rationally related to the conservation and management of pompano stock in federal waters because Florida can only extraterritorially regulate those fishing vessels.  Further, "[t]he burden is on the one

attacking the legislative arrangement to negative every conceivable basis which might support it." *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S. Ct. 406, 408 (1940) (citing *Lindsley v. Nat. Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S. Ct. 337, 340 (1911)).  Daniels has not satisfied this burden.[10]

Daniels's reliance on *Bateman v. Gardner*, 716 F. Supp. 595 (S.D. Fla. 1989), *aff'd*, 922 F.2d 847 (11th Cir. 1990) (unpublished table opinion), for the proposition that Florida's regulations violate the Equal Protection Clause is unpersuasive.  In *Bateman*, the District Court held that Florida's regulations against Florida vessels shrimping in a portion of the Dry Tortugas located in federal waters were unconstitutional as violative of the Equal Protection Clause.  716 F. Supp at 597–98.  The prohibition on Florida-registered vessels did not extend to non-Florida-registered vessels, resulting in an unreasoned discrimination that favored out-of-state shrimpers.  *Id.* at 597.  But, as we explained previously, Florida may only extraterritorially regulate Florida-registered fishing vessels in federal waters under 16 U.S.C. § 1856(a)(3).  The Equal Protection Clause mandates that Florida provide equal protection of the laws to persons within its jurisdiction; out-of-state vessels are without Florida's jurisdiction.  It would be insensible for states to be unable to regulate objects properly within their jurisdiction solely because

---

[10] Daniels primarily argues that no basis supports Florida's pompano regulations because Congress has preempted all state regulations which affect fishing.  Our disposition of Daniels's preemption claim leaves Daniels bereft of any arguments that could satisfy his burden.

those regulations could not embrace objects outside their jurisdiction. We reject *Bateman* to any extent it suggests otherwise.[11]

Accordingly, the District Court did not err in concluding at summary judgment that Florida's pompano regulations do not violate the Equal Protection Clause of the Fourteenth Amendment.

## VI.

For all these reasons, we conclude that although Daniels has standing to sue the FWC, Florida's pompano regulations are neither preempted by federal law nor violative of the Equal Protection Clause of the Fourteenth Amendment. We therefore affirm the District Court.

**AFFIRMED.**

---

[11] *Bateman* is an unpublished table opinion that is not binding on this Court. 11th Cir. R. 36-2 (citation of unpublished opinions). And at the time *Bateman* was decided, the Magnuson-Stevens Act had not yet been amended to clarify the authority of the states to extraterritorially regulate fishing vessels. But we take no position on *Bateman*'s alternative holding that federal restrictions on shrimping in the Dry Tortugas preempted Florida's conflicting regulations. 716 F. Supp. at 597–98. No federal restrictions on pompano fishing exist here.